**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL NO.  1:07CV196**

| | |
|---|---|
| **AUDREY T. TODD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **Vs.** ) | **MEMORANDUM** |
| ) | **AND ORDER** |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the parties' cross motions for

summary judgment.  For the reasons stated herein, Plaintiff's motion is

denied, and Defendant's motion is granted.

**I. STANDARDS OF REVIEW**

In Social Security cases, this Court may not conduct a *de novo*

review of the decision of an Administrative Law Judge (ALJ).  Rather,

pursuant to the Social Security Act, the factual findings of the

Commissioner of Social Security are conclusive, so long as they are

supported by substantial evidence.   **42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).**   The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**   Elaborating on this definition, the Fourth Circuit has defined "supported by substantial evidence" as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

***Hays*, *supra* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).**   "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." ***Id.***   Therefore, in examining the record to determine whether the ALJ's decision is supported by substantial evidence, a reviewing court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ. ***Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).**

Once it has been established that the ALJ's factual findings are supported by substantial evidence, the reviewing court must examine whether the ALJ's conclusions were "reached based upon a correct application of the relevant law." *Id.*; *see also Hays, supra* **(noting that review of the ALJ's decision includes consideration of "whether the correct law was applied").**

Each party in this case has moved for summary judgment. Summary judgment is appropriate when there is no genuine issue of material fact, and judgment for the moving party is warranted as a matter of law. **Fed. R. Civ. P. 56(c).** "A genuine issue [of fact] exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a motion for summary judgment, the Court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.*

By reviewing substantive law, the Court may determine what matters constitute material facts. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Id.* "The party seeking summary judgment has the initial burden to show a lack of evidence to support the nonmoving party's case." ***Shaw, supra.*** If that showing is made, the burden then shifts to the nonmoving party who must convince the court that a triable issue does exist. *Id.* A "mere scintilla of evidence" is not sufficient to defeat a motion for summary judgment. *Id.*

"In ruling on cross-motions for summary judgment, the court must rule on each motion independently, deciding whether each moving party has met their prospective burdens under Rule 56." ***Creech v. N.D.T. Indus., Inc.,*** **815 F. Supp. 165, 166 (D.S.C.1993).**

## II. PROCEDURAL HISTORY

The Plaintiff filed an application for disability insurance benefits on February 24, 2004. This claim was denied initially and upon reconsideration. **Transcript of Social Security Administration Proceedings ("Tr."), filed August 13, 2007, at 18.** On August 4, 2004, Plaintiff timely filed a request for a hearing on her application. *Id.* The hearing was held before an ALJ on August 2, 2005. *Id.* On September 7,

2005, the ALJ issued his written decision denying benefits to Plaintiff.  **Id. at 23.**

Plaintiff requested Appeals Council review and such was denied on April 4, 2007.  **Id. at 4.**  Plaintiff timely filed a complaint with this Court. **Complaint, filed June 1, 2007.**  Following Defendant's answer and his filing of the Transcript of Proceedings on August 13, 2007, the parties filed their respective motions for summary judgment.

## III. FINDINGS OF FACT

### A.  Plaintiff's Testimony

Plaintiff testified at the August 2, 2005, hearing that throughout her life she had worked at various clerical jobs, including several bank teller and secretarial positions.  **Tr., *supra*, at 261-63.**  She testified that she last worked as a sales assistant and office manager at a brokerage firm in Morehead City, North Carolina, in September 2001.  **Id. at 257-58.**  At this time, she took a leave of absence without pay in order to take a series of boat trips with her fiancé.  **Id. at 260.**  Plaintiff's employment relationship

with the brokerage firm came to a formal close in September 2002, when she moved to Arden, North Carolina. *Id.* **at 257, 260.**

When asked why she cannot presently work at any of the previous jobs she has held, or similar ones, Plaintiff testified, "I have the double vision. . . . I cannot sit for long or stand for long anymore, because my back is so bad now, that I just can't take the pain. And I can't lift things." *Id.* **at 263-64.** Specifically, she testified that 15 minutes of reading would necessitate 45 minutes of recuperation from double vision, and that she could only sit or stand for about 30 to 40 minutes at a time before her back pain became so intense she would have to lie down or move around. *Id.*

In explaining the causation for her vision problems, Plaintiff testified that "during the process [of a heart catheterization], they broke off some plaque, and it traveled to my brain, and caused a stroke, which left me with double vision." *Id.* **at 265.** As to the causation for her back problems, she stated, "[Dr. Smith] seems to think that some of this fatigue and muscle pain could be fibromyalgia. And Dr. Patton thinks a lot of the back pain may be spinal stenosis. And then I've got some arthritis in my lower back,

and bone spurs." *Id.* **at 269-70.** She also mentioned lupus as a possible contributor to her back pain. *Id.* **at 269.**

To address her various pain issues, Plaintiff testified that she takes over-the-counter Aleve because she cannot afford other medications. *Id.* **at 270.** She also stated that she had other, unspecified prescription pain pills and muscle relaxers. *Id.*

### B. Medical Evidence of Back Problems

The transcript of proceedings contains the following medical history relevant to her back pain.

On October 5, 2001, Plaintiff presented to the Emergency Department at Seacoast Medical Center in South Carolina, with complaints of shoulder pain. X-rays showed C5-6 degenerative disc disease changes. She was diagnosed with cervical neuropathy and muscle strains and released with a prescription for painkillers. *Id.* **at 108, 110.**

On September 17, 2002, Dr. Barton Arthur diagnosed Plaintiff with degenerative disc disease at C5-6 and mild spinal stenosis at L5-S1. He recommended exercises and anti-inflammatory medication. *Id.* **at 136.**

February 2004 treatment notes from Dr. David Cogburn indicated that Plaintiff had lesions on her face, but that biopsies of these lesions were negative. *Id.* **at 194.** Dr. Cogburn noted, "I told her I really think she is pre-lupus but I can't prove it and the best thing to do is just to watch her . . ." *Id.*

On April 27, 2004, Plaintiff underwent a physical examination with Dr. Antoinette Wall of Disability Determination Services, a division of the North Carolina Department of Health and Human Services. *Id.* **at 200.** Dr. Wall's notes describe the history of Plaintiffs' complaints, and then describe Plaintiff as a "48-year-old female without cane, braces, or other walking device. The patient is alert and cooperative in no acute distress." *Id.* **at 201.** Dr. Wall diagnosed Plaintiff as having, among other complaints: "Arthritis of the cervical and lumbar spines by history [and] Question of lupus, discoid versus systemic." *Id.* **at 202.**

On April 28, 2004, Dr. Richard Burris of the Hominy Valley Family Health Center noted that Plaintiff had been tested for fibromyalgia but no signs were found. He stated, "however, I would be glad to see her again and revisit this issue." *Id.* **at 204.**

On July 21, 2005, Plaintiff was seen by neurologist Dr. James Patton, who noted, "[Plaintiff] states she is here for evaluation for her low back, neck pain for her social security disability hearing, which is in a couple weeks." *Id.* at 239. After examining Plaintiff, Dr. Patton made the following observations:

> [Plaintiff] is having low back pain which is worse with prolong[ed] standing. I believe this patient has the symptoms of spinal stenosis and chronic back pain. It would be useful to get an MRI of L-spine to determine what is going on. However, due to lack of insurance and financial problems, she is unable to have this at the present time. Medication options were discussed with patient including pain medications and muscle relaxers. However, [patient] states she is using a muscle relaxer pm and does not want to start any new medications. . . . This will [impair] her ability to walk or stand for periods of time. She cannot perform anythin[g] with lifting or stooping of her back.

*Id.* at 241.

### C. Medical Evidence of Vision Problems

The transcript also contains the following medical history relevant to Plaintiff's vision problems.

On November 20, 2002, after complaining of chest pain, Plaintiff
received a heart catheterization at Memorial Mission Hospital in Asheville,
North Carolina.  *Id.* **at 146.**

On November 22, 2002, Plaintiff presented to the Emergency
Department at Mission Hospital with complaints of double vision.  An MRI
was performed, which "show[ed] a small foci of acute ischemia[1] suspected
involving the medial aspect of both the thalami and the right posterior
lateral occipital region."[2]  *Id.* **at 169 (footnote added).**  Plaintiff was
"discharged in stable condition" with a referral for follow-up care with
neurologist Dr. James Patton.  *Id.*

Dr. Patton evaluated Plaintiff in November 2002 and again in
February 2003 for her "acute onset of double vision after cardiac cath."  *Id.*
**at 234.**  He noted that her MRI in the emergency room "showed some
punctate[3] white matter abnormalities in the thalamus that were acute on

---

[1]"[D]eficiency of blood . . . usually due to functional constriction or
actual obstruction of a blood vessel."  ***Dorland's Illustrated Medical
Dictionary*, 861 (28th ed.).**

[2] Referring to the thalamus and occipital regions of the brain.  *Id.* **at
1167, 1695.**

[3] Small points or dots.  *Id.* **at 1389.**

both sides, and there was a small foci in the right posterolateral occipital region." *Id.* Dr. Patton recommended a referral to Dr. Robert Wiggins "to see if there are any opthalmologic options that he could offer to explain the double vision and/or treat it." *Id.* **at 235.**

Medical records from an opthalmologic consultation with Dr. Wiggins on September 10, 2003, indicate that Plaintiff's double vision "was initially constant and very bothersome, but now she is able to see single most of the time, although she still has intermittent diplopia[4] when she is tired. This is relieved by covering either eye." *Id.* **at 189 (footnote added).** Dr. Wiggins noted, "She has a small angle intermittent left hypertropia[5] and extropia[6] as a residual of a CVA which occurred last November." *Id.* **at 190 (footnotes added).** He indicated that these problems could be addressed by adjustments to Plaintiff's glasses. *Id.*

Plaintiff's April 27, 2004, physical examination with Dr. Wall of Disability Determination Services, described above, resulted in diagnoses

---

[4] Double vision. ***Dorland's, supra*, 475.**

[5] "[P]ermanent upward deviation of the visual axis of an eye." *Id.* **at 802.**

[6] The turning inside out of an organ. *Id.* **at 594.**

of "Embolic CVA during heart catheterization with residual diplopia [and] Migraine headaches, post embolization." *Id.* **at 202.**

Plaintiff returned to Dr. Wiggins for a follow-up appointment on July 20, 2005. *Id.* **at 236.** Plaintiff reported continued double vision but stated that, as before, the problem resolved upon covering either eye. She also reported "blurred vision for near work." *Id.* Dr. Wiggins again recommended modifications to her glasses. As to her diagnosis, he stated: "She has a convergence insufficiency intermittent extropia. . . . Her chorodial nevus[7] in the left eye appears stable." *Id.*

Plaintiff returned to Dr. Patton on July 21, 2005, as noted above. In relation to Plaintiff's eyesight, Dr. Patton noted the following:

> This patient continues to have double vision as a result of her stroke in 2002. The double vision has improved slightly over the last couple of years. On exam, the double vision is worse when looking down and with hand-eye coordination which will make it difficult for her to take on certain tasks such as writing, reading, operating machinery, etc.

*Id.* **at 241.**

---

[7] A flat or slightly raised malformation of the vascular coat of the eye that supples blood to the retina that is hereditary rather than due to external causes. ***Dorland's, supra*, at 324, 1135-36.**

## IV.  ALJ'S CONCLUSIONS

Disability under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A).**   In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process.  ***Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); 20 C.F.R. § 416.920.**

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of medical condition, age, education, or work experience.  ***Pass***, ***supra.***  Second, the claimant must show a severe impairment, that is, an impairment or combination of impairments that significantly limits physical or mental ability to do basic work activities.  ***Id.*** Third, the ALJ considers whether the claimant meets or equals one of the impairments listed in the regulations.  If so, the claimant will be considered disabled regardless of age, education, or work experience.  ***Id.*** Fourth, if the impairment is not a listed impairment but is nonetheless severe, the

ALJ reviews the claimant's residual functional capacity and the physical and mental demands of work done in the past.  If the claimant can still perform such work, then the ALJ will find the claimant is not disabled.  *Id.*  Fifth, if the claimant has a severe impairment and cannot perform past relevant work, the ALJ will consider whether the claimant's residual functional capacity, age, education, and past work experience enable the performance of other work. *Id.*

If the ALJ finds that a claimant has not satisfied any step of this process, review does not proceed to the next step.  ***Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992).***  Through the fourth step, the burden of production and proof is on the claimant.  *Id.*  If the claimant reaches step five, the burden shifts to the Secretary to produce evidence that other jobs exist in the national economy that the claimant can perform considering her age, education, and work experience.  *Id.*

In this case, the ALJ's determination was made at the fourth step. He determined that she has not engaged in substantial gainful activity, that her impairments were severe, and that her impairments did not meet or equal a listed impairment.  **Tr.,** *supra***, at 22.**  However, he found that her

residual functional capacity enabled her to perform medium exertion work, and that her past relevant work in clerical positions did not require the performance of work-related activities precluded by this residual functional capacity. *Id.* He also found that "the claimant's allegations regarding her limitations are not totally credible." *Id.* Therefore, he concluded Plaintiff was not under a "disability" as defined in the Social Security Act, and concluded she should be denied benefits.

## V.  DISCUSSION

In her motion for summary judgment, Plaintiff first argues that the ALJ's determination of her residual functional capacity was not based on substantial evidence.  Defendant's motion for summary judgment claims otherwise.

According to federal regulations, "[y]our residual functional capacity is the most you can still do despite your limitations." **20 C.F.R. §§ 404.1545(a), 416.945(a).**  The record contains the following evidence relating to Plaintiff's residual functional capacity and/or limitations on her activities:

(1)  On May 25, 2000, Plaintiff presented to Dr. Barton Arthur with "neck pain, low back pain, some intermittent radiculopathy." **Tr.,** ***supra***, **at 136.**  With respect to her ability to function, Dr. Arthur stated: "She has been on her belly trying to get a suntan.  I have stopped that, also various aspects about work.  I have asked her not to do things that bother her . . . ." ***Id.***

(2) On October 8, 2002, Plaintiff returned to Dr. Arthur with "severe neck pain radiating into the left arm." ***Id.***  He found that she had a full range of motion in her neck and back. ***Id.***

(3) Dr. Frank Virgili completed a physical residual functional capacity assessment of Plaintiff on May 24, 2003, which stated that Plaintiff could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, and sit for a total of about 6 hours in an 8-hour workday. ***Id.*** **at 180.**  Dr. Virgili found no other limitations on her capacity, whether postural, manipulative, visual, communicative, or environmental. ***Id.*** **at 181-83.**

4) On July 26, 2005, Dr. Patton noted that Plaintiff was having "low back pain which is worse with prolong[ed] standing . . . . [Plaintiff] states she is using a muscle relaxer pm and does not want to start any new

medications. . . .  This will impa[ir] her ability to walk or stand for periods of time.  She cannot perform anythin[g] with lifting or stooping of her back." *Id.* **at 241.**

(5)  Dr. Wall assessed Plaintiff on August 2, 2005.  *Id.* **at 243.**  She stated that Plaintiff was suffering from diplopia, degenerative disc disease, and chronic back pain.  *Id.*  She also stated that Plaintiff should occasionally be able to bend, squat, kneel, crawl, reach above shoulder level, and lift 10 pounds or less.  *Id.*  In response to a question on her form asking whether she could anticipate that Plaintiff could return to a level of functioning that would allow her to perform and sustain full-time employment, Dr. Wall simply noted, "Difficulty and vision changes."  *Id.* **at 245.**

(6) Plaintiff testified at her hearing on August 2, 2005, that she could not drive; that she read for periods of 15 minutes but then would need to rest for 45 minutes; that if she covered one eye and tried to read, the words would disappear off the page within a few minutes; that she could not "sit for long or stand for long" due to back pain; that she could not lift anything heavier than a fork; that she could not perform basic

housekeeping tasks like vacuuming, gardening, or cooking; that she could not squat, bend, or negotiate steps; that she could not sleep at night; that she could not brush her teeth or use the bathroom by herself; that she could not look at a computer screen for more than 15 minutes; that she could not go shopping; and that she was "pretty much home bound." *Id.* **at 250, 252, 256, 263-64, 266-69, 278-79, 284.**

Based on this evidence, the ALJ found that Plaintiff's residual functional capacity enabled her to do medium exertion work. *Id.* **at 21.** He stated that he adopted Dr. Virgili's assessment, and that even if he "were to accept the exertional and postural limitations suggested by Dr. Wall and Dr. Patton . . . she could perform her past relevant work as a bank teller, office assistant, secretary and office manager as performed in the national economy." *Id.* As to Plaintiff's testimony – the only evidence in the record contrary to his finding – he stated that "the claimant's allegations regarding her limitations are not totally credible[.]" *Id.* **at 22.**[8]

---

[8] Plaintiff claims separately in her motion for summary judgment that the ALJ failed to address conflicts in the evidence. As discussed above, the crucial conflict in the evidence is Plaintiff's testimony and her reports of her pain to her doctors, versus the doctors' objective findings. Contrary to Plaintiff's position here, the ALJ did address this conflict by specifically

As noted above, "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson, supra.** In this case, in light of the fact that the functional assessments of four different doctors indicate that Plaintiff is capable of doing her past relevant work in the secretarial and clerical fields, the undersigned concludes that substantial evidence exists to support the ALJ's finding that Plaintiff's residual functional capacity enables her to do medium exertion work.

Plaintiff's motion for summary judgment also argues that (1) the ALJ erred by stating he "was not impressed with the assessments of Dr. Patton or Dr. Wall, because neither of these are supported by the objective findings," **Tr., *supra*, at 21-22**; (2) the ALJ erred by failing to consider medical evidence supporting Plaintiff's subjective claims of pain and double vision; (3) the ALJ failed to consider all of Plaintiff's impairments; and (4) the ALJ's credibility assessment was flawed. All of these arguments pertain, in one way or another, to the ALJ's assessment of Plaintiff's credibility and his weighing of the evidence. As noted above,

noting that Plaintiff's representations were not wholly credible.

however, "it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." **Hays, supra.** A reviewing court may not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ. **Craig, supra.** Accordingly, the undersigned is unable to give any effect to the remainder of Plaintiff's arguments on appeal.

For the foregoing reasons, the ALJ's decision denying disability benefits to Plaintiff is affirmed.

## VI. ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiff's motion for summary judgment is **DENIED** and Defendant's motion for summary judgment is **GRANTED.** This matter will be dismissed by the judgment filed herewith.

Signed: February 26, 2008

Lacy H. Thornburg
United States District Judge